IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

AFLAC INCORPORATED, in its *
capacity as Plan Sponsor and
Administrator of American *
Family Corporation Retirement
Plan for Senior Officers, and *
AMERICAN FAMILY CORPORATION          CASE NO. 4-11-CV-81 (CDL)
RETIREMENT PLAN FOR SENIOR *
OFFICERS,
                                     *
     Plaintiffs,
                                     *
vs.
                                     *
SALVADOR DIAZ-VERSON, JR., and
PORTER BRIDGE LOAN COMPANY, *
INC.,
                                     *
     Defendants.

_____

O R D E R

In this declaratory judgment and interpleader action,

Plaintiff AFLAC seeks guidance on whether and to what extent the

monthly payments it owes to its former employee, Defendant

Salvador Diaz-Verson, Jr. ("Diaz-Verson"), are subject to

garnishment by Defendant Porter Bridge Loan Company, Inc.

("Porter Bridge").[1] Diaz-Verson contends that the payments are

"retirement benefits" that are not subject to garnishment.

AFLAC and Porter Bridge maintain that the payments arise from a

_____

[1] AFLAC also sought a temporary restraining order and injunctive relief
as to the state court garnishment actions filed by Porter Bridge,
which was resolved by this Court's Order Granting Plaintiffs' Motion
for Preliminary Injunction (ECF No. 8).

top hat pension plan under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, ("ERISA") or alternatively the compromise of a disputed pension claim, and therefore, at least twenty-five percent of the payments are subject to garnishment.[2]   Since filing this action, AFLAC has periodically deposited into this Court's registry twenty-five percent of the amount that it is legally obligated to pay Diaz-Verson.   Diaz-Verson seeks a release of all funds paid into this Court by AFLAC arguing that none of AFLAC's payments are subject to garnishment.   Alternatively, Diaz-Verson seeks the release of $14,631.32 of the interpleaded funds, which were paid into the Court pursuant to a "continuing garnishment" filed by Porter Bridge.   Diaz-Verson maintains that the "continuing garnishment" was improper because he was not an employee of AFLAC at the time of the garnishment.   Diaz-Verson's Mot. to Release Funds 2, ECF No. 42.   Porter Bridge contends that it is entitled to all funds interpleaded into the Court and to a minimum of twenty-five percent of any amounts AFLAC owes Diaz-Verson until the judgment Porter Bridge obtained against him is satisfied.   Both Diaz-Verson and Porter Bridge seek summary judgment on the declaratory judgment/interpleader issues—in essence, whether the payments from AFLAC are subject to garnishment, and if so, to

---

[2] Porter Bridge argues that 100% of the portion of the payments that are for perquisites are subject to garnishment.

what extent.  *See generally* Diaz-Verson's Mot. for Partial Summ. J. as to Count I, ECF No. 38; Porter Bridge's Mot. for Summ. J., ECF No. 61.

In addition to the declaratory judgment and interpleader issues, Diaz-Verson filed a cross-claim against Porter Bridge, alleging that Porter Bridge fraudulently obtained and domesticated the underlying judgment that Porter Bridge seeks to collect through garnishment.  Porter Bridge moves to dismiss the cross-claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and also seeks Federal Rule of Civil Procedure 11 ("Rule 11") sanctions regarding Diaz-Verson's cross-claims.  Porter Bridge's Mot. to Dismiss, Mot. for Att'ys Fees, and Mot. for Sanctions, ECF No. 39 [hereinafter Porter Bridge's Mot. to Dismiss].

For the following reasons, the Court finds that twenty-five percent of the amounts owed by AFLAC to Diaz-Verson are subject to garnishment by Porter Bridge.  Accordingly, the Court grants in part Porter Bridge's Motion for Summary Judgment (ECF No. 61) and denies Diaz-Verson's motion for summary judgment as to Count I (ECF No. 38).[3]  The Court dismisses Diaz-Verson's cross-claims *sua sponte* for lack of subject matter jurisdiction, making Porter Bridge's Rule 12(b)(6) motion to dismiss the cross-claims

---

[3] The Court denies Porter Bridge's motion to the extent it seeks more than twenty-five percent of the amounts owed to Diaz-Verson by AFLAC.

(ECF No. 39) moot, but the Court denies Porter Bridge's motion for Rule 11 sanctions (ECF No. 39) as to those cross-claims. The Court also denies Diaz-Verson's Motion for Leave to Amend Crossclaim (ECF No. 67).  Finally, the Court denies Diaz-Verson's Motion to Release Funds (ECF No. 42).

DISCUSSION

The Court divides its discussion into three parts.  Part I addresses the declaratory judgment and interpleader issues presented by the summary judgment motions of Diaz-Verson and Porter Bridge and concludes that twenty-five percent of the payments owed by AFLAC to Diaz-Verson, including payments for perquisites, are subject to garnishment by Porter Bridge.  Part II addresses Diaz-Verson's motion to release those payments garnished by Porter Bridge pursuant to a "continuing garnishment" procedure and concludes that those payments are subject to garnishment and should not be released to Diaz-Verson.  Part III addresses Porter Bridge's motion to dismiss Diaz-Verson's cross-claims for fraud relating to the underlying state court judgments and resulting garnishments and concludes that the cross-claims must be dismissed for lack of subject matter jurisdiction.

I.   **Motions for Summary Judgment as to Whether and to What Extent Payments are Subject to Garnishment**

A.   Summary Judgment Standard

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   A fact is *material* if it is relevant or necessary to the outcome of the suit.   *Id.* at 248.   A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

B.   Factual Background

The following facts are undisputed for purposes of summary judgment unless otherwise noted.

Diaz-Verson was an employee of American Family Corporation ("AFLAC").   AFLAC offered a retirement plan for its senior officers: the American Family Corporation Retirement Plan for Senior Officers ("the Plan").   Sept. 7, 2011 TRO Hr'g Ex. P-1, Loudermilk Decl. Attach. 1, American Family Corp. Retirement Plan for Senior Officers ¶ I., ECF No. 25-1 at 24-33 of 145 [hereinafter Plan].   On October 25, 1989, Diaz-Verson became a

5

participant in the Plan. *Id.* at 10, ECF No. 25-1 at 33. Retirement eligibility under the Plan is based on age and service status. Participants are eligible for voluntary retirement with full benefits after attaining twenty or more years of credited service. *Id.* at 2 ¶ III.B., ECF No. 25-1 at 25. Participants who have not attained twenty years of credited service and who are involuntarily terminated from employment with more than ten years of credited service are entitled to "[r]etirement with reduced benefits (based on years of actual credited service expressed as a percentage of 20 years)." *Id.* at 3 ¶ III.E., ECF No. 25-1 at 26.

Diaz-Verson and AFLAC entered into a series of subsequent agreements regarding payments due to him by AFLAC as a Plan participant. AFLAC and Diaz-Verson entered into an Employment Agreement on August 1, 1990. Loudermilk Decl. Attach. 1, Employment Agreement, ECF No. 25-1 at 54-70 of 145 [hereinafter Employment Agreement]. This agreement stated that Diaz-Verson's term of employment was three years, to end on July 31, 1993, unless extended or terminated earlier as provided in the agreement. *Id.* ¶ 4, ECF No. 25-1 at 55. The agreement also provided that the term would be extended annually in one-year periods, unless one of the parties gave written notice of termination to prevent extension before the annual date. *Id.* Because Diaz-Verson was still employed on the annual extension

date of August 1, 1991, he states that his employment termination date extended one year from the original date to July 31, 1994.   Def. Salvador Diaz-Verson, Jr.'s Mot. for Partial Summ. J. & Br. in Supp. Thereof as to Count I of the Compl. Attach. 1, Diaz-Verson Decl. ¶ 4, ECF No. 38-1.   The Employment Agreement also provided that Diaz-Verson would continue participating in the Plan.   Employment Agreement ¶ 9, ECF No. 25-1 at 56.

On August 14, 1991, AFLAC and Diaz-Verson entered into a Separation Agreement prior to the end of the term under the original Employment Agreement.   Loudermilk Decl. Attach. 1, Separation Agreement, ECF No. 25-1 at 34-53 [hereinafter Separation Agreement].   The agreement was "entered into for the purpose of compromising and settling disputed claims and to avoid time-consuming and expensive litigation."   *Id.* ¶ 16, ECF No. 25-1 at 50.   The Separation Agreement stated that "[a]ll agreements, covenants, undertakings and obligations agreed to by Diaz-Verson or [AFLAC] in this Agreement, the Employment Agreement and the Retirement Plan for Senior Officers, which are ongoing and continuing after his termination of employment shall remain in full force and effect in accordance with the terms thereof."   *Id.* ¶ 10, ECF No. 25-1 at 46.   Pursuant to the Separation Agreement, Diaz-Verson agreed to tender his resignation in writing as an officer and employee, and this

resignation would be "treated as a termination by [AFLAC] 'without good cause.'" *Id.* ¶ 3, ECF No. 25-1 at 38.

The Separation Agreement further provided that, among other things, Diaz-Verson would be entitled to bonus compensation and the benefits under the Employment Agreement through July 31, 1994 and "payment thereafter as provided by the Retirement Plan for Senior Officers." *Id.* ¶ 3(a), ECF No. 25-1 at 38. AFLAC also agreed to make "payment to Diaz-Verson (or, if elected by Diaz-Verson, his wife) of all retirement benefits for a 'voluntary retirement with full benefits' under the Retirement Plan, with such benefits to commence on August 1, 1994." *Id.* ¶ 3(e), ECF No. 25-1 at 40-41. He would also continue to accrue credited service as an employee under that Plan through July 31, 1994. *Id.* On September 2, 1991, Diaz-Verson notified AFLAC of his election to adopt full retirement with the surviving spouse benefit. Loudermilk Decl. Attach. 1, Letter from S. Diaz-Verson, Jr. to M. Durant (Sept. 2, 1991), ECF No. 25-1 at 23 of 145.

On July 13, 1995, Diaz-Verson filed a complaint for declaratory judgment, *Diaz-Verson v. AFLAC, Inc.*, No. 5:95-CV-00321 (M.D. Ga. July 13, 1995), "seeking, among other things, an interpretation of the benefits under the Retirement Plan." Loudermilk Decl. Attach. 1, Settlement Agreement 2, ECF No. 25-1 at 4 of 145. That prior action was dismissed pursuant to a

Settlement Agreement between Diaz-Verson and AFLAC dated February 10, 1997. *Id.* ¶ 7, ECF No. 25-1 at 11. The agreement reflected the parties' "resolution of all disputes and claims between and among them of any kind and character arising out of or in any manner connected directly or indirectly with the . . . Plan and/or the Litigation." *Id.* at 2, ECF No. 25-1 at 4. The agreement also contained a release by Diaz-Verson of any claims against AFLAC and its employee benefit plans as of the date of the Settlement Agreement, including claims or rights "arising out of or related to Salvador Diaz-Verson's employment or separation from employment with AFLAC, the Separation Agreement, and any and all rights, claims or causes of action arising out of or related to the Retirement Plan . . . ." *Id.* ¶ 15.a, ECF No. 25-1 at 14. The Settlement Agreement stated that Diaz-Verson severed his employment with AFLAC according to the Separation Agreement, was paid under the Employment Agreement as if employed until August 1, 1994, and "retired from AFLAC effective July 31, 1994." *Id.* at 1, ECF No. 25-1 at 3.

The Settlement Agreement calculated that according to the Plan, the amount due under the Plan for 1996 was 54% of Diaz-Verson's total compensation, which included salary and cash bonuses. *Id.* ¶¶ 2.a. & 3, ECF No. 25-1 at 5-6. The agreement further concluded that the base figure is paid pursuant to the Plan and is subject to future increases provided for by the

Plan.   The agreement also entitled Diaz-Verson to a $10,000
payment and perquisites, "in addition to those amounts paid
under Paragraph IV of the Retirement Plan," in specified amounts
for the years 1996 to 2000.  *Id.* ¶¶ 4-5, ECF No. 25-1 at 6-7.
From 2001 until Diaz-Verson's death, the agreement entitled him
to perquisites from AFLAC in the sum of $90,000 per year.  *Id.* ¶
5.c., e, ECF No. 25 at 8-10.   The agreement contained a merger
clause: "This Settlement Agreement incorporates by reference
herein and makes a part hereof the Retirement Plan for Senior
Officers and all Exhibits attached hereto including, but not
limited to, the Separation Agreement . . . ., and sets forth the
entire agreement and understanding between the parties."  *Id.* ¶
22, ECF No. 25-1 at 18.

After these agreements, Porter Bridge, an Alabama lending
institution, obtained a deficiency judgment issued on October
30, 2009 against Diaz-Verson.   According to that judgment,
because of a final judgment in foreclosure, Diaz-Verson owed
$397,386.87 plus interest to Porter Bridge.  Compl. Ex. 1, Final
J. of Deficiency ¶¶ 5-6, *Porter Bridge Loan Co. v. SALCO
Enters., LLC,* No. 2008 CA 000538 (Fla. Cir. Ct. Oct. 30, 2009),
ECF No. 1-2 [hereinafter Final J. of Deficiency].  Porter Bridge
domesticated that judgment in Georgia on June 23, 2010.  Compl.
Ex. 2, Order to Domesticate Foreign Judgment, *Porter Bridge Loan
Co. v. Salco Enters., LLC,* Civil Action No. HS-10-CV-011 (Ga.

Harris Cnty. Super. Ct. June 23, 2010), ECF No. 1-3. Thereafter, Porter Bridge filed garnishments against AFLAC to collect on the judgment by garnishing payments made to Diaz-Verson by AFLAC under the forgoing agreements. AFLAC identified the payments as in the nature of retirement benefits and paid twenty-five percent of the funds subject to garnishment into the registry of the Superior Court of Muscogee County. Some of the funds have been disbursed by the Superior Court to Diaz-Verson, while others have been held in the court registry.

Diaz-Verson filed a complaint in the United States District Court for the Middle District of Florida seeking a judgment requiring continued payment of funds to him. AFLAC's motion to dismiss was granted for lack of personal jurisdiction over AFLAC and improper venue. *Diaz-Verson v. AFLAC Inc.*, No. 8:11-CIV-852-T-17-TBM, 2012 WL 398329 (M.D. Fla. Feb. 8, 2012). Prior to that court granting dismissal, AFLAC filed its Complaint in this Court. This Court enjoined the parties from proceeding with the garnishment actions in the Superior Court, attempting to enforce orders related to the funds, and seeking to disburse payments made by AFLAC until declaration by the Court (ECF No. 8) and ordered AFLAC to deposit garnishment funds into the Court registry (ECF No. 9).

C.   Analysis

Diaz-Verson seeks a declaratory judgment that the benefits paid to him and due to him from AFLAC are retirement benefits that are exempt from garnishment under ERISA and/or O.C.G.A. § 18-4-22.   Porter Bridge seeks a contrary declaration that twenty-five percent of the non-perquisite payments and 100% of the perquisite payments made to Diaz-Verson are subject to garnishment.   Both Diaz-Verson and Porter Bridge argue that they are entitled to summary judgment.   Although AFLAC has not filed its own motion for summary judgment, it takes the position that twenty-five percent of the payments owed to Diaz-Verson, whether they are for perquisites or not, are subject to garnishment.

Porter Bridge and AFLAC contend that AFLAC's payments to Diaz-Verson are subject to garnishment because they are not subject to ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1), which protects certain pension plan benefits from garnishment. Porter Bridge and AFLAC argue that the anti-alienation provision does not apply here because either: (1) the Plan is a top hat plan; or alternatively, (2) because the payments arise not from the Plan but from a "contested pension claim," namely the Separation and Settlement Agreements. Diaz-Verson argues that regardless of whether the Plan is a top hat plan, the Plan is still an ERISA benefits plan under 29 U.S.C. § 1002(2)(A), and the Georgia anti-garnishment statute, O.C.G.A. §

18-4-22, exempts from garnishment all funds or benefits from a 29 U.S.C. § 1002(2)(A) plan. The Court finds that Porter Bridge and AFLAC have the more persuasive argument.

Under ERISA's anti-alienation provision, "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). This prohibition extends to voluntary and involuntary assignments, including garnishments. *Gen. Motors Corp. v. Buha*, 623 F.2d 455, 460 (6th Cir. 1980). Under this statute, funds and benefits from a qualified pension plan cannot be garnished. *Travelers Ins. Cos. v. Fountain City Fed. Credit Union*, 889 F.2d 264, 266 (11th Cir. 1989) (per curiam) (App., Clemon, J., Mem. Op.); *Tenneco Inc. v. First Va. Bank of Tidewater*, 698 F.2d 688, 689 (4th Cir. 1983). Top hat plans, however, are exempt from ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1), and are thus assignable and subject to garnishment. *See* 29 U.S.C. § 1051(2) (exempting certain plans from 29 U.S.C. § 1056(d)(1)); *Buha*, 623 F.2d at 460.[4] The parties agree that the AFLAC Plan is an ERISA top hat plan. *See Holloman v. Mail-Well Corp.*, 443 F.3d 832, 837 (11th Cir. 2006) ("A top hat plan is 'a plan which is unfunded and is maintained by an employer primarily for the

---

[4] Top hat plans are exempt from certain ERISA provisions based on the rationale that "high-level employees are in a strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees." *Holloman*, 443 F.3d at 837 (internal quotation marks omitted).

purpose of providing deferred compensation for a select group of management or highly compensated employees.'") (quoting 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1)).  Therefore, payments under that Plan are subject to garnishment, unless some other reason exists for their exemption.

Diaz-Verson argues that Georgia law exempts the payments from garnishment.  Citing Georgia statutory law, he maintains that all funds or benefits from pension programs as defined in 29 U.S.C. § 1002(2)(A), including top hat plans, are exempt from garnishment.  O.C.G.A. § 18-4-22(a).  The Court rejects Diaz-Verson's interpretation of the Georgia statute.  Reading the statute in conjunction with the ERISA anti-alienation provisions, the Court finds that retirement benefits paid pursuant to top hat plans are not exempt from garnishment under Georgia law.  To the extent that the Georgia statute is inconsistent with this interpretation, it is preempted by ERISA. 29 U.S.C. § 1144(a); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985); *see also Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 829-30 (1988) (holding former exemption to the Georgia garnishment statute, O.C.G.A. § 18-4-22.1, preempted by ERISA because the statute expressly referenced ERISA plans and singled out welfare benefit plans for different treatment in state garnishment proceedings).

Accordingly, the Plan payments to Diaz-Verson are subject to garnishment because the Plan is a top hat plan.[5]

The next question is to what extent the payments are subject to garnishment. Georgia law limits the amount subject to garnishment to twenty-five percent of "disposable earnings." O.C.G.A. § 18-4-20(d)(1). Disposable earnings includes periodic payments made pursuant to a pension or retirement program. O.C.G.A. § 18-4-20(a). Porter Bridge argues that this twenty-five percent limitation does not apply to payments for perquisites. Diaz-Verson and AFLAC contend that the perquisite payments are made as part of the periodic payments to Diaz-Verson and are, thus, disposable earnings subject to the twenty-five percent limitation.

O.C.G.A. § 18-4-20 determines the amount of funds subject to garnishment under the following definitions:

> (1) "Disposable earnings" means that part of the earnings of an individual remaining after the deduction from those earnings of the amounts required by law to be withheld.
>
> (2) "Earnings" means compensation paid or payable for personal services, whether denominated as wages,

---

[5] Moreover, AFLAC's payments to Diaz-Verson are being made based on the settlement of a contested pension claim arising from a top hat plan. Therefore, the payments are also subject to garnishment because they arise from a contested pension claim separate and apart from whether the claim arose from a top hat plan. *Lynn v. CSX Transp., Inc.*, 84 F.3d 970, 975 (7th Cir. 1996) (holding that ERISA's anti-alienation provision "does not impose a bar on settlement agreements wherein pension claims are knowingly and intentionally resolved by employees.").

salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program.

O.C.G.A. § 18-4-20(a).  By limitation, the statute provides:

the maximum part of the aggregate disposable earnings of an individual for any work week which is subject to garnishment may not exceed the lesser of: (A) Twenty-five percent of his disposable earnings for that week; or (B) The amount by which his disposable earnings for that week exceed 30 times the federal minimum hourly wage prescribed by Section 6(a)(1) of the Fair Labor Standards Act of 1938, U.S.C. Title 29, Section 206(a)(1), in effect at the time the earnings are payable.

O.C.G.A. § 18-4-20(d)(1).  The Georgia Court of Appeals has "interpret[ed] the phrase 'aggregate disposable earnings' to mean that if the employer against whom the garnishment is filed has control or possession of more than one item or source of earnings, only those items or sources would be added together and the appropriate formula applied to determine to what extent the subsection (d) exemption applied." *Parham v. Lanier Collection Agency & Serv., Inc.*, 178 Ga. App. 84, 85, 341 S.E.2d 889, 891 (1986).  The Court has located no case addressing whether a perquisite payment qualifies as "earnings" or "disposable earnings" under the statute.

The Court can conceive of no reason why payments for perquisites should be carved out of the disposable earnings protected by the statute's twenty-five percent limitation.  The legislature did not choose to treat periodic payments that

include compensation for perquisites different from other periodic payments that do not, and the plain language of the statute does not disclose any such intention. Moreover, Porter Bridge has not articulated a statutory basis for any such distinction. The Court finds that the twenty-five percent garnishment limitation under O.C.G.A. § 18-4-20(d)(1) applies to all payments owed by AFLAC to Diaz-Verson. Therefore, Porter Bridge is only entitled to garnish twenty-five percent of all payments owing from AFLAC to Diaz-Verson.

AFLAC has been periodically making payments into the registry of the Court pursuant to this interpleader action. Those payments have equaled twenty-five percent of each payment AFLAC has paid to Diaz-Verson. Porter Bridge is now entitled to the proceeds being held in the registry of the Court, unless Diaz-Verson can convince the Court that any of those payments should be released to him. As discussed in the following discussion, Diaz-Verson's argument that he is entitled to a portion of the interpleaded funds is unpersuasive.

## II.   Diaz-Verson's Motion for Release of Funds Paid Pursuant to "Continuing Garnishment"

Diaz-Verson seeks release of $14,631.32 paid by AFLAC into the Court registry pursuant to a continuing garnishment filed by Porter Bridge in the Superior Court of Muscogee County and this Court's Order to Deposit Funds into Registry of Court, ECF No.

9.  *See generally* Diaz-Verson's Mot. to Release Funds, ECF No. 42.  On September 13, 2011, Porter Bridge filed a continuing garnishment in the Superior Court of Muscogee County supported by an affidavit alleging AFLAC and Diaz-Verson were in an employment relationship.  Answering this garnishment, AFLAC paid $14,631.32 into the Court's registry.  Subsequently, but before any further payments were garnished, Porter Bridge dismissed the continuing garnishment action against Diaz-Verson.  Mot. to Release Funds Ex. D, Dismissal Without Prejudice, ECF No. 42-4. Porter Bridge then resumed filing ordinary garnishments.

Diaz-Verson argues he is entitled to the $14,631.32 on two grounds: (1) the continuing garnishment was unlawful under Georgia law because O.C.G.A. § 18-4-110 limits continuing garnishment to wages paid within the employer-employee relationship and AFLAC and Diaz-Verson were not in such a relationship at the time the garnishment was filed; and (2) because Porter Bridge dismissed the continuing garnishment action, any payments thereunder are to be returned to Diaz-Verson because the claims against the funds were abandoned by the dismissal.

Continuing garnishment is in addition to a traditional garnishment remedy.  O.C.G.A. § 18-4-110.  A "plaintiff shall be entitled to the process of continuing garnishment against any garnishee who is an employer of the defendant against whom the

judgment has been obtained." *Id.* If an employment relationship between the garnishee and the defendant does not exist at the time the summons for continuing garnishment is served, the garnishee may state that no employment relationship exists and if no traverse is filed "the garnishee shall be automatically discharged from further liability and obligation . . . with respect to the period of continuing garnishment remaining after the employment relationship." O.C.G.A. § 18-4-117. It is clear that only *employer* garnishees are subject to continuing garnishment. Because continuing garnishment is an additional process to traditional garnishment proceedings under Georgia law, O.C.G.A. § 18-4-110, "[O.C.G.A.] § 18-4-117 does not, however, purport to discharge a non-employer garnishee from such *general* garnishment liability and obligation as was otherwise *in existence* at the time his original answer was filed." *Melnick v. Fund Mgmt., Inc.*, 172 Ga. App. 773, 776, 324 S.E.2d 595, 597 (1984). Rather, a non-employer garnishee is only "entitled to an automatic discharge pursuant to [O.C.G.A.] § 18-4-117 from *further* liability and obligation." *Id.* at 776, 324 S.E.2d at 598. Therefore, even if AFLAC was not an employer of Diaz-Verson at the time of service of the summons of continuing garnishment, the one-time payment of funds amounting to $14,631.32 into the Court registry in answer to this garnishment were properly paid by AFLAC according to traditional garnishment

19

proceedings.    Accordingly,   Diaz-Verson   is   not   entitled   to release   of   these   funds   even   if   AFLAC   was   not   his   employer   when Porter   Bridge   filed   the   summons   for   continuing   garnishment.

As   to   Diaz-Verson's   second   argument   that   Porter   Bridge abandoned   its   claim   to   these   funds   by   dismissing   the   continuing garnishment   after   AFLAC's   payment,   Diaz-Verson   fails   to   point   to any   legal   authority   in   support   of   this   proposition.    The   Court finds   no   basis   for   Diaz-Verson's   assertion   of   abandonment   and finds,   as   discussed   above,   that   the   one-time   payment   by   AFLAC under   the   continuing   garnishment   was   proper.    Accordingly,   Diaz-Verson's   Motion   to   Release   Funds   (ECF   No.   42)   is   denied,   and Porter   Bridge   is   entitled   to   100%   of   the   funds   paid   into   the registry   of   this   Court   by   AFLAC.

### III. Porter   Bridge's   Motion   to   Dismiss   Diaz-Verson's   Cross-Claims & Motion for Attorney's Fees & Sanctions

In   his   cross-claims   against   Porter   Bridge,   Diaz-Verson alleges   that   Porter   Bridge   and   its   attorneys:   (1)   fraudulently obtained   foreclosure   and   deficiency   judgments   in   Escambia County,   Florida;   (2)   domesticated   a   foreign   judgment   in   Georgia by   fraudulent   statement,   knowing   the   judgment   debtor's   stated address   to   be   false;   and   (3)   fraudulently   garnished   Diaz-Verson's   payments   from   AFLAC   based   on   a   fraudulently domesticated   judgment.    Diaz-Verson's   Answer   11-16,   ECF   No.   26. Porter   Bridge   moves   to   dismiss   Diaz-Verson's   cross-claims   and

seeks Rule 11 sanctions for having to defend against these claims.[6] Def. Porter Bridge's Mot. to Dismiss, Mot. for Atty's Fees, & Mot. for Sanctions, ECF No. 39 [hereinafter Porter Bridge's Mot. to Dismiss]. As explained below, Diaz-Verson's cross-claims must be dismissed for lack of subject matter jurisdiction based upon the *Rooker-Feldman* doctrine.[7] The Court, however, denies Porter Bridge's motion for Rule 11 sanctions.

A.   *Sua Sponte* Dismissal for Lack of Subject Matter Jurisdiction

Although Porter Bridge seeks to dismiss Diaz-Verson's cross-claims pursuant to Rule 12(b)(6) for failure to state a claim, the Court finds *sua sponte* that it lacks subject matter jurisdiction over the cross-claims, and therefore, dismisses them for that reason. *See Jackson v. Farmers Ins. Grp./Fire Ins. Exch.*, 391 F. App'x 854, 856-57 (11th Cir. 2010) (per curiam) (affirming a district court's *sua sponte* dismissal of plaintiff's complaint under the *Rooker-Feldman* doctrine and stating that "a district court may *sua sponte* consider subject matter jurisdiction at any stage in the litigation and must dismiss a complaint if it concludes that subject matter jurisdiction is lacking.") (citing Fed. R. Civ. P. 12(h)(3)). In evaluating a facial challenge to subject matter jurisdiction,

---

[6] The Court finds no reason to convert Porter Bridge's Motion to Dismiss into a summary judgment motion as the parties discussed at the March 30, 2012 hearing.
[7] *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413, 416 (1923).

the Court may consider the pleadings and any attachments thereto. *E.g., Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212, 1214 n.4 (11th Cir. 2005). As with a motion to dismiss pursuant to Rule 12(b)(6), the Court "may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Speaker v. U.S. Dep't of Health & Human Servs.*, 623 F.3d 1371, 1379 (11th Cir. 2010) (internal quotation marks omitted). Specifically, "[a] court may take judicial notice of another court's orders to recognize judicial action or the litigation's subject matter." *Jiles v. United Parcel Serv., Inc.*, 413 F. App'x 173, 174 (11th Cir. 2011) (per curiam); *accord United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

B.   Factual Background Regarding Cross-Claims

The facts taken in the light most favorable to Diaz-Verson as to his cross-claims against Porter Bridge are as follows.

In 2008, Porter Bridge issued a notice of lis pendens and foreclosure action on property in Escambia County, Florida arising from a default on a note and mortgage that Diaz-Verson had guaranteed. Diaz-Verson alleges that Porter Bridge was not the real party in interest because Colonial Bank, N.A. owned the mortgage and note at the time the foreclosure action was filed.

As discussed above, after a judgment of foreclosure on the property, Porter Bridge obtained a deficiency judgment in

Florida, stating that Diaz-Verson and Salco Enterprises, LLC, jointly and severally owed $397,386.87 plus interest to Porter Bridge.  Final J. of Deficiency ¶¶ 5-6, ECF No. 1-2.  Porter Bridge sought to collect the deficiency judgment in Georgia and garnish property belonging to Diaz-Verson in Georgia.  Porter Bridge's attorneys filed a Notice of Filing Foreign Judgment and affidavit in the Superior Court of Harris County, Georgia, alleging that judgment debtor Diaz-Verson's last known address was in Fortson, Georgia.  According to Diaz-Verson, the company and its attorneys purportedly failed to give notice to Diaz-Verson, knew that Diaz-Verson had never lived at the stated address or used the address for any purpose, and knew that Diaz-Verson had been living in Florida.  Diaz-Verson's Answer 12-13 ¶¶ 9-10, 12.  Nonetheless, as discussed above, in June 2010, Porter Bridge successfully domesticated the judgment.  Based on this judgment, Porter Bridge filed numerous garnishment actions in Muscogee County, Georgia.  In response to these garnishments, AFLAC paid twenty-five percent of each garnished payment owed to Diaz-Verson to the Clerk of Court of Muscogee County or into this Court's registry, amounting to more than $102,000.

> C.   Analysis of Cross-Claims

Each of Diaz-Verson's cross-claims relies on allegations that were decided against him in the underlying state court actions or relates to rulings that could have been challenged in

those state actions.   Diaz-Verson first cross-claims that Porter Bridge obtained fraudulent foreclosure and deficiency judgments in Florida state courts.   The cross-claim specifically alleges that Porter Bridge was not the party in interest in the Florida foreclosure action because it did not own the mortgage or the note subject to foreclosure.   It also alleges that Porter Bridge committed slander to title by filing the foreclosure in a way that prevented Diaz-Verson from accepting a bona fide offer to purchase the property.   These issues were decided against Diaz-Verson when the Florida court issued the deficiency judgment against him which had the effect of confirming the validity of the foreclosure proceedings.   Diaz-Verson offers no persuasive reason for failing to challenge the Florida foreclosure proceeding in the Florida courts.

In his second cross-claim, Diaz-Verson alleges that Porter Bridge and its attorneys fraudulently domesticated the Florida deficiency judgment in the Superior Court of Harris County, Georgia.   Diaz-Verson made this same argument in the action before the Georgia superior court in a motion to vacate the domestication of the deficiency judgment.   He argued there as he does here that Porter Bridge and its counsel knew Diaz-Verson was a resident of Florida not living at the Fortson, Georgia address and thus the domestication order was procured by fraud. Porter Bridge's Mot. to Dismiss Ex. L, Order on Mot. to Vacate

24

1, *Porter Bridge Loan Co. v. Salco Enters., LLC*, No. HS-10-CV-011 (Ga. Harris Cnty. Super. Ct. July 12, 2011), ECF No. 39-12. That court held that Porter Bridge had a good faith basis as to Diaz-Verson's "last known address" and properly domesticated the judgment issued in Florida. *Id.* at 2. The order denying Diaz-Verson's Motion to Vacate Order to Domesticate Foreign Judgment affirmed the domestication order, ended the suit, and was final and appealable. Diaz-Verson did not appeal. *See R.J. Reynolds Tobacco Co. v. Fischer*, 207 Ga. App. 292, 293, 427 S.E.2d 810, 811-12 (1993) (an order is final under Georgia law where no issues remain for resolution in that court).

Finally, Diaz-Verson cross-claims that Porter Bridge engaged in fraudulent garnishment actions in the Superior Court of Muscogee County, Georgia based on the fraudulently domesticated judgment.

Under the *Rooker-Feldman* doctrine, "'a United States District Court has no authority to review final judgments of a state court in judicial proceedings. Review of such judgments may be had only in the [United States Supreme Court].'" *Narey v. Dean,* 32 F.3d 1521, 1524 (11th Cir. 1994) (alteration in original) (quoting *Feldman,* 460 U.S. at 482). This doctrine "'is confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting

district court review and rejection of those judgments.'"
*Alvarez v. Att'y Gen. for Fla.*, __ F.3d __, No. 11-10699, 2012
WL 1579489, at *5 (11th Cir. May 8, 2012) (quoting *Exxon Mobil
Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005)).
The Eleventh Circuit has explained that the "doctrine operates
as a bar to federal court jurisdiction where the issue before
the federal court was 'inextricably intertwined' with the state
court judgment so that (1) the success of the federal claim
would 'effectively nullify' the state court judgment, or that
(2) the federal claim would succeed 'only to the extent that the
state court wrongly decided the issues.'"   *Id.* (quoting *Casale
v. Tillman*, 558 F.3d 1258, 1260 (11th Cir. 2009) (per curiam)).

For each of Diaz-Verson's cross-claims, the issues that
this Court is called upon to resolve are inextricably
intertwined with the underlying state court judgments.   Any
determination by this Court as to fraud in the Florida
foreclosure and deficiency actions would "effectively nullify"
those state court judgments and thus *Rooker-Feldman* bars this
Court's jurisdiction over these claims.   *Casale*, 558 F.3d at
1260.   Similarly, Diaz-Verson's cross-claim related to the
Georgia action domesticating the Florida judgment seeks to
nullify the Georgia state court's judgment and finding of no
fraud.   A federal court challenge to this judgment is, thus,
exactly what the *Rooker-Feldman* doctrine prohibits: a federal

case brought by a state-court loser complaining of an injury caused by a state-court judgment rendered before this action was filed and effectively seeking district court review and rejection of the state-court judgment. *See Exxon-Mobil,* 544 U.S. at 284. Therefore, the Court has no jurisdiction over Diaz-Verson's cross-claim alleging that Porter Bridge fraudulently domesticated the deficiency judgment. Finally, the cross-claim attacking the subsequent garnishments could have been brought in the state court, and this Court does not have jurisdiction to reevaluate each superior court garnishment. *See Id.* In sum, Diaz-Verson's cross-claims must be dismissed because this Court lacks subject matter jurisdiction over those claims under the *Rooker-Feldman* doctrine.[8]

Diaz-Verson also filed a motion for leave to amend his cross-claim. Mot. for Leave to File First Am. Cross-cl., ECF No. 67. Because any amendments to these claims will not change the result that they are barred by *Rooker-Feldman*, this motion is denied. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (per curiam) ("[L]eave to amend 'shall be freely given

---

[8] Even if the *Rooker-Feldman* doctrine did not deprive this Court of jurisdiction to consider Diaz-Verson's cross-claims, the Court, upon considering them, would be required to dismiss them pursuant to Rule 12(b)(6) for failure to state a claim based upon the principles of res judicata and collateral estoppel. *See 126th Ave. Landfill, Inc. v. Pinellas Cnty.*, No. 10-14529, 2012 WL 739387, at *2 (11th Cir. Mar. 7, 2012) (per curiam); *Lops v. Lops*, 140 F.3d 927, 950 (11th Cir. 1998) (Kravitch, J., dissenting) (quoting *Kent v. Kent*, 265 Ga. 211, 211, 452 S.E.2d 764, 766 (1995)).

when justice so requires.' . . . A district court need not, however, allow an amendment . . . where amendment would be futile.") (quoting Fed. R. Civ. P. 15(a)(2)).

D.    Motion for Attorney's Fees & Sanctions

Porter Bridge seeks attorney's fees and sanctions under Federal Rule of Civil Procedure 11 ("Rule 11") for having to defend against Diaz-Verson's cross-claims.  Porter Bridge argues it is entitled to attorney's fees under Rule 11 because Diaz-Verson's cross-claims were meritless, frivolous, and brought only to cause delay in resolution of the case. *See* Fed. R. Civ. P. 11(b)(1)-(2).  The Court does not find that Diaz-Verson's cross-claims were sufficiently frivolous to authorize Rule 11 sanctions.  The Court observes that Porter Bridge did not even raise in its motion to dismiss or in its Rule 11 letters to Diaz-Verson this Court's lack of subject matter jurisdiction under *Rooker-Feldman*.  Instead, Porter Bridge sought dismissal on the merits solely pursuant to Rule 12(b)(6).  While a *sua sponte* dismissal based on lack of subject matter jurisdiction may under certain circumstances authorize Rule 11 sanctions, the Court finds that the focus should be upon whether the party asserting the claim had a good faith basis that subject matter jurisdiction existed.  In this case, the fact that Porter Bridge's counsel never recognized the Court's lack of jurisdiction suggests that Diaz-Verson's conclusion that the

Court had subject matter jurisdiction, albeit wrong, was not frivolous. Because the Court did not dismiss the cross-claims on the merits pursuant to Porter Bridge's Rule 12(b)(6) motion and because it would be inappropriate to address those arguments before resolving the Court's jurisdiction, the Court finds it unnecessary to evaluate for Rule 11 purposes whether Diaz-Verson's counsel should be sanctioned for filing the cross-claims in light of the res judicata and collateral estoppel defenses. The appropriate determination is whether the assertion of the claims in light of the reasons for the Court's dismissal of them authorizes sanctions. Under the circumstances of this case and based upon the lack of any finding of bad faith, the Court denies Porter Bridge's motion for Rule 11 sanctions.

CONCLUSION

To summarize, twenty-five percent of the amount owed by AFLAC to Diaz-Verson is subject to garnishment by Porter Bridge; Diaz-Verson is not entitled to receive the funds garnished under the "continuing garnishment"; the Court lacks subject matter jurisdiction over Diaz-Verson's cross-claims; and Porter Bridge is not entitled to Rule 11 sanctions. Accordingly, the Court grants Porter Bridge's Motion for Summary Judgment (ECF No. 61) to the extent it seeks twenty-five percent of the amounts owed by AFLAC to Diaz-Verson, but the Court denies the motion to the

extent that it seeks more than twenty-five percent of those payments. The Court dismisses Diaz-Verson's cross-claims *sua sponte* for lack of subject matter jurisdiction, making Porter Bridge's Rule 12(b)(6) motion to dismiss (ECF No. 39) moot. The Court also denies Porter Bridge's motion for attorney's fees and sanctions (ECF No. 39). The Court further denies Diaz-Verson's Motion for Partial Summary Judgment (ECF No. 38), Diaz-Verson's Motion to Release Funds (ECF No. 42), and Diaz-Verson's motion for leave to amend his cross-claim (ECF No. 67). In light of these rulings, the remaining motions that are pending (ECF Nos. 64, 84, 96, & 97) are moot.

Today's rulings resolve all outstanding issues in this case, and therefore, the Court directs the Clerk to release the funds held in the Court's registry to Porter Bridge pursuant to the Order to Deposit Funds into Registry of Court, ECF No. 9, and orders AFLAC to cease making any further payments into the Court registry.[9] The Clerk shall not disburse these funds until thirty (30) days after the date of today's Order. Going forward, AFLAC shall be guided by the rulings in today's Order.

---

[9] As of the last payment received by the Court on April 17, 2012, the amount of funds deposited by AFLAC into the Court registry is $112,204.48 plus interest earned on the account in the amount of $18.36 for a total of $112,222.84. The Clerk shall pay to Porter Bridge this sum and any other payments made into the Court registry between April 17, 2012 and issuance of today's Order.

IT IS SO ORDERED, this 25th day of May, 2012.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE